**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pamela Ballard, | No. CV-19-05658-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Terros Incorporated, | |
| Defendant. | |

Pamela Ballard ("Ballard") sued her former employer, Terros, Inc. ("Terros"), for discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehabilitation Act"). After Terros moved for summary judgment (Doc. 29), Ballard's attorney withdrew and Ballard thereafter failed to file a response, prompting Terros to move for summary disposition (Doc. 36). For the following reasons, Terros's motion for summary disposition is denied but its motion for summary judgment is granted.

## BACKGROUND

I.   <u>Underlying Facts</u>

The following facts are derived from the evidence attached to Terros's motion for summary judgment and other materials in the record. As discussed in more detail below, because Ballard did not respond to Terros's motion, these facts are undisputed.

Terros is a nonprofit healthcare provider specializing in "mental health, physical health, addiction recovery, and wellness interventions." (Doc. 29-1 at 2 ¶ 3.) Ballard

became a Terros employee in 2014 after Terros acquired her previous employer.  (*Id.* at 2 ¶ 9.)  Ballard worked as a "Practice Manager" at Terros's Dunlap clinic until its closure in late July 2018.  (*Id.* at 2 ¶ 10; Doc. 29-2 at 27 ¶ 3.)  Terros retained many of its employees from the Dunlap location, transferring them to its 27th Avenue clinic.  (Doc. 29-1 at 2 ¶ 11; Doc. 29-2 at 27 ¶ 4.)  Because the 27th Avenue clinic already had a Practice Manager, Terros did not transfer Ballard there.  (Doc. 29-1 at 2 ¶ 12; Doc. 29-2 at 27 ¶ 4.)

Instead of terminating Ballard's employment, Terros created a new "Floating Practice Manager" position for her.  (Doc. 29-1 at 2 ¶ 13; Doc. 29-2 at 27 ¶ 5.)  As a Floating Practice Manager, Ballard was responsible for filling in for Practice Managers at various locations if they were sick, on vacation, or otherwise unavailable.  (Doc. 29-1 at 3 ¶ 14.)  Ballard's pay remained the same in her new role.  (*Id.* at 3 ¶ 15.)

In declarations, Ballard's supervisor (Rosalia DeLeon) and Terros's Senior Director of Human Resources (Lorie Birk) both state that Ballard was informed before accepting the Floating Practice Manager role that she would be expected to report to the Broadway location when she was not covering shifts for absent Practice Managers at other clinics.  (Doc. 29-1 at 3 ¶ 19; Doc. 29-2 at 27 ¶ 6.)

In an email to a Terros administrator dated July 17, 2018, Ballard acknowledged that she had been told "the need [for a Floating Practice Manager] is for Broadway" and asked why she was the only Practice Manager being considered for the floating role.  (Doc. 29-3 at 9.)  The administrator responded that, because the Dunlap clinic was closing, the Broadway location was Terros's only clinic in need of additional help.  (*Id.*)

On July 18, 2018, DeLeon emailed Birk to note that she had spoken with Ballard about her new Floating Practice Manager role.  (Doc. 29-1 at 6.)  The email characterized Ballard's change in position as a "transition to Broadway" and noted that because there was no need for a full-time Practice Manager at the Broadway location, "the expectation is for her to cover for other [Practice Managers]" as needed.  (*Id.*)

Shortly before starting in her new position, Ballard requested a three-week leave of absence under the Family Medical Leave Act ("FMLA").  (Doc. 30 [lodged under seal].)

1    Terros granted this request.  (Doc. 29-1 at 3 ¶ 17.)

2          On August 20, 2018, Ballard returned to work without restrictions.  (*Id.* at 3-4 ¶¶ 18,

3    27; Doc. 29-2 at 27 ¶ 7.)  Upon her return, Ballard was told that she would initially fill in

4    twice per week for the Practice Manager at Terros's 51st Avenue location and would report

5    to the Broadway location the remaining three days per week.  (Doc. 29-2 at 27 ¶ 8.)  After

6    the 51st Avenue location's Practice Manager returned from leave, Ballard would report to

7    Broadway every day until she was needed to cover a vacancy at another branch.  (*Id.*)

8          On August 22, 2018, Ballard sent an email to DeLeon stating that she did not recall

9    being told that she would be required to report to the Broadway location on a daily basis.

10   (Doc. 29-3 at 7.)  Ballard explained that she was under the impression she would be

11   "'floating' all over the agency," rather than reporting to work consistently at the Broadway

12   location.  (*Id.*)  Ballard also mentioned that working from the Broadway location would

13   require her to drive "60 plus miles extra per day" and stated that such travel would be

14   difficult because of her personal and family obligations.  (*Id.*)

15         Although Terros still needed Ballard to report to the Broadway location, Terros

16   attempted to make scheduling adjustments based on Ballard's requests.  In an August 24,

17   2018 email, DeLeon laid out a new "tentative schedule" based on Ballard's input, but noted

18   that Ballard would still be required to stay late at least one night per week.  (Doc. 29-3 at

19   13.)

20         In the scheduling discussions that occurred during her first week as Floating Practice

21   Manager, Ballard never mentioned being disabled.  (Doc. 29-1 at 3-4 ¶¶ 23, 26-27; Doc.

22   29-2 at 17, 28 ¶¶ 12-16.)  Ballard admitted during her deposition that she only discussed

23   "the actual scheduling" in her emails with her supervisor.  (Doc. 29-2 at 17.)

24         On August 31, 2018, Ballard's counsel drafted a letter, which was addressed to

25   Terros's CEO, stating that Ballard believed she was "being treated differently and unfairly

26   based on her age, sex, and disability."  (Doc. 29-4 at 9-10.)  The letter explained that Ballard

27   saw Terros's offer of a Floating Practice Manager position as pressure for her to resign.

28   (*Id.*)  The letter further stated that, because of her relative seniority, Ballard believed she

should have been offered one of the existing Practice Manager positions and that the Floating Practice Manager role should have gone to someone more junior.  (*Id.*)  The letter also stated that "Ms. Ballard is suffering from some conditions where she will be asking for reasonable accommodation."  (*Id.* at 10.)  The letter suggested that reasonable accommodations might include "not work[ing] more than 8 hours a day . . . in a position where commuting is minimal."  (*Id.*)

It is undisputed on this record that, even though the letter was addressed to Terros's CEO, Terros's management never actually received the letter "until well after Ballard resigned from her employment with Terros."  (Doc. 29-1 at 3 ¶¶ 24-25; Doc. 29-4 at 12, ¶¶ 3-4.)  It is also undisputed on this record that "neither Ballard nor her counsel[] ever asked anyone at Terros about the Letter and/or why no response was provided and/or whether Terros even received the letter."  (Doc. 29-1 at 3 ¶ 25.)  Had Ballard or her counsel notified Terros that Ballard was interested in seeking a reasonable accommodation for a disability, "she would have been given documentation for her physician to fill out and the parties would have engaged in further discussions to determine if Ballard was eligible for a reasonable accommodation and if so, the type of reasonable accommodation(s) that would assist Ballard in performing the essential functions of her position."  (Doc. 29-1 at 4 ¶ 26.)

Ballard acknowledged during her deposition that the language of the August 31, 2018 letter merely noted that she *would be* requesting accommodations and that the letter itself did not make such a request.  (Doc. 29-2 at 11.)  Ballard further conceded that she never directly asked for the potential accommodations mentioned in the August 31, 2018 letter (because Terros did not respond to the letter).  (*Id.* at 12.)

Ballard testified that she asked a different supervisor for a "reasonable schedule" on one occasion in September 2018.  (*Id.* at 12.)  During that conversation, Ballard explained that her schedule was stressful but did not suggest that she was disabled.  (*Id.* at 11-12.)

On October 6, 2018, Ballard emailed DeLeon to express her interest in a Practice Manager position at the Terros's 27th Avenue branch that had recently become vacant.  (*Id.* at 18.)  DeLeon instructed her to apply for the position in the same manner as external

1    applicants.  (*Id.*)  Ballard applied for this role but did not hear anything further about her

2    application until after she resigned from Terros.  (*Id.* at 18-19.)

3        On January 2, 2019, Ballard sent an email to a Terros representative announcing her

4    "official resignation from TerrosHealth" effective that day.  (Doc. 29-4 at 2.)

5    II.    Procedural History

6        On November 13, 2018, Ballard filed a complaint with the Equal Employment

7    Opportunity Commission ("EEOC") regarding Terros's alleged failure to grant her

8    reasonable accommodations as mandated by the ADA and the Rehabilitation Act.  (Doc. 1

9    ¶ 14; Doc. 12 ¶ 14.)

10       On December 10, 2018, the EEOC submitted its Notice of Charge of Discrimination

11   to Terros.  (Doc. 29-4 at 14-17.)

12       On August 23, 2019, the EEOC issued a Right to Sue Letter to Ballard.  (Doc. 1 ¶

13   5; Doc. 12 ¶ 5.)

14       On November 20, 2019, Ballard, through counsel, initiated this action.  (Doc. 1.)

15   The complaint asserts two claims: Count One is a claim for discrimination (*id.* ¶¶ 36-38)

16   and Count Two is a claim for retaliation (*id.* ¶¶ 39-42).[1]

17       On September 25, 2020, Terros filed the pending motion for summary judgment.

18   (Doc. 29.)

19       On November 5, 2020, Ballard's counsel filed a motion to withdraw.  (Doc. 32.)

20   Among other things, counsel confirmed that Ballard had "been provided with a Consent to

21   Withdraw but has not returned the document.  She has provided an email terminating my

22   services."  (*Id.* ¶ 3.)  Counsel also certified that Ballard had "been sent a notification in

23

24   ───────────────

[1]    The complaint also includes a section entitled "Constructive Discharge."  (Doc. 1
¶¶ 43-44.)  The law is unsettled as to whether constructive discharge ever operates as a
standalone claim.  *Compare Cogdell v. Murphy*, 2020 WL 6822683, *13 (D.D.C. 2020)
("There is some dispute in this district over whether constructive discharge can be a
standalone cause of action."), *with Moussouris v. Microsoft Corp.*, 2018 WL 3584701, *19
n.20 (W.D. Wash. 2020) ("constructive discharge is not a standalone claim"), *and Ibrahim
v. Fidelity Brokerage Servs. LLC*, 2020 WL 107104, *4 n.5 (S.D.N.Y. 2020) (same).  It is
unnecessary to wade into that debate here because it is clear from the complaint, which
denominates the discrimination claim as "Count One" and the retaliation claim as "Count
Two" but does not include a "Count Three," that Ballard was not alleging constructive
discharge as a separate cause of action.

writing of the status of the case" and had specifically "been notified of the pendency of the Motion for Summary Judgment." (*Id.* ¶ 2.)

On November 24, 2020, after the 14-day deadline to file a response had expired without any response by Ballard, the Court granted counsel's motion to withdraw. (Doc. 34.) The Court also extended, to December 10, 2020, Ballard's deadline to respond to the pending summary judgment motion. (*Id.*)

On March 26, 2021—more than three months after this extended deadline had expired without any response by Ballard—Terros filed the pending motion for summary disposition. (Doc. 36.) Ballard did not respond to that motion, either.

## DISCUSSION

### I.   Motion For Summary Disposition

As noted, Terros has moved for "summary disposition" of its motion for summary judgment due to Ballard's failure to respond. (Doc. 36.) According to Terros, "Plaintiff's failure to file a timely response should be deemed as Plaintiff's consent to the granting of the Motion" under LRCiv 7.2(i). (*Id.* at 1.)

This argument lacks merit. The advisory committee's notes to Rule 56's 2010 amendment explain that "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion." This is because "under the summary judgment standard, if the moving party fails to meet its initial burden of production, the opposing party need not produce anything." *Finkle v. Ryan*, 174 F. Supp. 3d 1174, 1181 (D. Ariz. 2016). Thus, "a local rule permitting a district court to treat a lack of a response as consent to granting a motion does not apply to summary judgment motions." *Id.* at 1180.

Instead, in the summary judgment context, "the opposing party's failure to respond to a fact asserted in" a summary judgment motion merely "permits a court to consider the fact undisputed for purposes of the motion." *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (internal quotation marks omitted). Rule 56 does not, in contrast, "condon[e] summary judgment by default." *Id.*

Accordingly, Terros's motion for summary disposition is denied.

1    II.    Motion For Summary Judgment

2           A.    **Legal Standard**

3           "The court shall grant summary judgment if [a] movant shows that there is no

4    genuine dispute as to any material fact and the movant is entitled to judgment as a matter

5    of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of

6    the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

7    in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

8    1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable

9    to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

10   *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is

11   improper where divergent ultimate inferences may reasonably be drawn from the

12   undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

13          A party moving for summary judgment "bears the initial responsibility of informing

14   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

15   depositions, answers to interrogatories, and admissions on file, together with the affidavits,

16   if any,' which it believes demonstrate the absence of a genuine issue of material fact."

17   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of

18   production, the moving party must either produce evidence negating an essential element

19   of the nonmoving party's claim or defense or show that the nonmoving party does not have

20   enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

21   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . .

22   [the] moving party carries its burden of production, the nonmoving party must produce

23   evidence to support its claim or defense." *Id.* at 1103.

24          "If the nonmoving party fails to produce enough evidence to create a genuine issue

25   of material fact, the moving party wins the motion for summary judgment." *Id.* There is

26   no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty

27   Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not

28   significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same

time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

### B.   Count One: Failure To Accommodate

In Count One of the complaint, Ballard alleges that Terros violated the ADA and the Rehabilitation Act by failing to accommodate her scheduling requests and failing to engage in the interactive process. (Doc. 1 ¶¶ 36-38.) To establish a prima facie case for failure to accommodate under either statute, Ballard must show: (1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (ADA); *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007) (Rehabilitation Act), *superseded by statute on other grounds as recognized in Nunies v. HIE Holdings, Inc.*, 908 F.3d 428 (9th Cir. 2018).

In its motion, Terros seeks summary judgment on Count One because (1) Ballard never provided notice of her alleged disability, and thus Terros could not have discriminated against her based on that disability and had no obligation to engage in the interactive process related to it; (2) Ballard never suffered an adverse action due to any real or perceived disability; and (3) Ballard "would not have been able to perform the essential functions of her position" if granted the accommodations discussed in her complaint. (Doc. 29 at 11-14.) As explained below, the Court agrees with Terros's first argument and thus does not reach the others.

Under the ADA and the Rehabilitation Act, employers have a legal duty to reasonably accommodate the "known physical or mental limitations of an otherwise

qualified . . . employee." 42 U.S.C. § 12112(b)(5)(A). *See also Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816-17 (9th Cir. 1999) (applying reasonable accommodation standard under the ADA and the Rehabilitation Act). "Implicit in th[is] statutory dut[y] is that the employer actually *know* of the alleged disability in question. Without such knowledge, an employer cannot be faulted for failing to accommodate the disability." *Ludovic v. Kaiser Permanente*, 57 F. Supp. 3d 1176, 1198-99 (N.D. Cal. 2014). *See also Maes v. Henderson*, 33 F. Supp. 2d 1281, 1289-90 (D. Nev. 1999) ("[A]n employer has no duty to provide a reasonable accommodation [under the Rehabilitation Act] until it has been made aware of the disability-related limitations of an employee."); *Tsuji v. Kamehameha Schools*, 154 F. Supp. 3d 964, 978 (D. Haw. 2015) ("[T]here is no obligation to explore possible accommodations unless an employer knows about an employee's disability."). "While knowledge of [a] disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts. Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under . . . the ADA." *Doutherd v. Montesdeoca*, 2020 WL 6043952, *16 (E.D. Cal. 2020) (internal quotation marks omitted).

On this record, no rational trier of fact could conclude that Terros knew Ballard was disabled or believed she was disabled. Ballard acknowledged in her deposition that the only mention of any health issues in connection with her various scheduling requests came in the August 31, 2018 letter written by her counsel. (Doc. 29-2 at 10-13.) In contrast, Ballard never mentioned being disabled or having any health-related objections to her schedule when corresponding with Terros staff during her first week as Floating Practice Manager or in subsequent in-person conversations.

As a preliminary matter, Terros's declarations establish that relevant personnel never received the August 31, 2018 letter and were not aware of its existence. Accordingly, no rational trier of fact could conclude that the letter imparted notice to Terros of Ballard's alleged disability. *Cf. Maes*, 33 F. Supp. 2d at 1290 ("[T]he agency certainly could not

1   have been expected to provide accommodation to Plaintiff until it had been informed of his

2   mental disability and corresponding limitations on Plaintiff's ability to work.").

3           Further, even assuming the letter was sent and received, it merely asserts that

4   Ballard "is suffering from some conditions," without specifying what those conditions are

5   or whether they constitute a disability.  This vague and conclusory statement does not

6   establish that Ballard informed Terros of her alleged disability—the mere utterance of the

7   word "disability," which appeared in the first paragraph of the August 31, 2018 letter, is

8   alone insufficient.  *See, e.g., Doutherd*, 2020 WL 6043952 at *16 ("Vague or conclusory

9   statements revealing an unspecified incapacity are not sufficient . . . ."); *Salser v. Clarke*

10  *Cty. Sch. Dist.*, 802 F. Supp. 2d 1339, 1355 (M.D. Ga. 2011) (plaintiff's "vague

11  complaints" about her schedule being difficult did not trigger interactive process under the

12  ADA); *Knighton v. Univ. of Tex. at Arlington*, 2020 WL 1493554, *6 (N.D. Tex. 2020)

13  (plaintiff's "vague and conclusory assertions" that employer knew of her disability, in the

14  absence of a clear disclosure, were insufficient to support a prima facie case for failure to

15  accommodate under the ADA).  On this record, no reasonable trier of fact could conclude

16  that Terros was aware of Ballard's alleged disability or that Ballard made an effective

17  accommodation request.  *Cf. Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1153 (9th

18  Cir. 1997) ("Summers has not shown that there is a triable issue of fact as to whether

19  Teichert reasonably accommodated any disability he may have had.  Summers did not ask

20  Teichert to allow him to drive a different vehicle after Summers' painful experience driving

21  the water truck in May.  After reporting to his supervisor the discomfort and pain that

22  resulted from driving the water truck, Summers did not contact Teichert at all.").[2]

23          The only time Ballard provided Terros with any documentation of a medical issue

24  was when she requested and received FMLA leave before starting as Floating Practice

25

26  _____

    [2]      Moreover, the letter merely informed Terros that Ballard "will be asking for
27  reasonable accommodation" at some unspecified point in the future. (Doc. 29-4 at 10.) In
    her deposition, Ballard acknowledged that the letter didn't actually constitute an
28  accommodation request and that she simply planned "[t]o discuss it with Terros." (Doc.
    29-2 at 11.)  She also acknowledged that she never made a formal request for an 8-hour-
    day accommodation because she never heard back about the letter.  (*Id.* at 12.)

Manager.  (Doc. 29-1 at 3 ¶ 17.)  But at the end of her FMLA leave, Ballard's physician cleared her to return to work with no restrictions.  (*Id.* at 3-4 ¶¶ 18, 27; Doc. 29-2 at 27 ¶ 7.)  This episode did not put Terros on notice of Ballard's alleged disability.  Quite the opposite—"[a] doctor's release to work without restrictions supports a finding that a person no longer suffers from a 'disability.'"  *Garcia v. Salvation Army*, 918 F.3d 997, 1010 (9th Cir. 2019).  *See also Rivera v. FedEx Corp.*, 2013 WL 6672401, *4 (N.D. Cal. 2013) (plaintiff failed to demonstrate disability where cleared by doctor without restrictions); *Stevenson v. Abbott Labs.*, 639 F. App'x 473, 474 (9th Cir. 2016) ("[A]fter Plaintiff was released to work, she was not disabled.").

Accordingly, Terros is entitled to summary judgment on Count One.

C.      **Count Two: Retaliation Claim**

In Count Two of the complaint, Ballard asserts a retaliation claim under the ADA and Rehabilitation Act.  (Doc. 1 ¶¶ 39-42.)

The Ninth Circuit applies the *McDonnell Douglas* burden-shifting framework to ADA and Rehabilitation Act retaliation claims.  *Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003); *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1035 (C.D. Cal. 2014) ("[T]he legal elements and the production of proof for a retaliation claim under the Rehabilitation Act is the same as that used under the ADA[.]").  Under this framework, "the plaintiff must first establish a prima facie case of retaliation."  *Brooks*, 1 F. Supp. 3d at 1036.  To establish a prima facie case for retaliation, Ballard "must show that: (1) [she] engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two."  *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004).

In its motion, Terros seeks summary judgment on Count Two "because 1) [Ballard] did not request any reasonable accommodations to allow her to perform the essential functions of her job; 2) she was never subjected to an adverse employment action; and 3) there is no causal link between any alleged protected activity and an adverse employment action."  (Doc. 29 at 14-15.)  As explained below, the Court agrees.

1            1.    <u>Adverse Employment Action</u>

For purposes of a retaliation claim under the ADA, "[a]n adverse employment action is any action reasonably likely to deter employees from engaging in protected activity." *Pardi*, 389 F.3d at 850 (internal quotation marks omitted).

Ballard contends she was subjected to two adverse employment actions.  First, she asserts that Terros assigned her undesirable working hours.  (Doc. 1 ¶ 12.)  "Typically, a change in schedule will not constitute an adverse employment action." *Peck v. City of Tucson*, 2021 WL 24578, *6 (D. Ariz. 2021).  *See also Arakaki v. Brennan*, 771 F. App'x 783, 784 (9th Cir. 2019) ("[W]e conclude that . . . Arakaki's change in shift schedule . . . did not constitute [an] adverse employment action[] that [was] reasonably likely to deter employees from engaging in protected activity.") (citation and internal quotation marks omitted).  Nor does denying an employee's request for a schedule change necessarily amount to an adverse employment action.  *Cilione v. Techfive, LLC*, 2020 WL 1932275, *6 (D. Or. 2020) ("[S]ome courts have considered the denial of a schedule change insufficient to constitute an adverse employment action."); *Hargrow v. Federal Exp. Corp.*, 2006 WL 269958, *4 (D. Ariz. 2006) (concluding that "Defendants' failure to accommodate his work scheduling requests . . . simply does not rise to the level of [an] adverse employment action[]").

Second, Ballard asserts that Terros engaged in adverse action in response to her expression of interest in applying for a new internal job opening closer to her home.  (Doc. 1 ¶ 24.)  When she conveyed her interest in the role, she was instructed to "apply for the position and follow the same process as external candidates."  (*Id.* ¶ 23.)

"[C]ourts disagree on whether failure to interview . . . constitutes adverse employment action for the purposes of" a retaliation claim.  *Alozie v. Arizona Bd of Regents*, 431 F. Supp. 3d 1100, 1115 (D. Ariz. 2020).  But here, Ballard does not allege that Terros failed to interview her for the internal job opening.  In fact, she admits that, shortly after she resigned from her Floating Practice Manager position, Terros extended her an interview invitation for the open position she sought.  (Doc. 29-2 at 18-19.)

Even taking into account the Ninth Circuit's "expansive view of the types of action that qualify as an adverse employment action," *Brooks*, 1 F. Supp. 3d at 1036, Ballard has not met her prima facie burden of establishing an adverse employment action. Regarding the reassignment, Terros has provided unrefuted testimony that this was done to *facilitate* Ballard's continued employment after her work location was shut down (and thus allowed her to remain employed). The Court is not aware of any case holding that such conduct constitutes an adverse employment action. As for the requirement that Ballard go through ordinary recruitment channels when she applied for a new position, the Court is likewise not aware of (and, needless to say, Ballard does not cite) any case stating that an employer's requirement that an employee apply for a new position in the same manner as other applicants constitutes an adverse employment action.

For these reasons alone, Terros is entitled to summary judgment on Count Two.

### 2.   Causal Connection With Protected Activity

Alternatively, even if the aforementioned matters could be deemed to qualify as adverse actions, Count Two fails for the independent reason that no reasonable trier of fact could find a causal connection between those adverse actions and Ballard's alleged instances of protected activity.

The complaint alleges that Ballard engaged in protected activity in two ways: (1) when she requested reasonable accommodations; and (2) when she submitted a formal EEOC complaint. (Doc. 1 ¶ 39.)

Ballard's first theory is easily rejected. Requesting a reasonable accommodation for a disability does, to be sure, qualify as protected activity. *Gipaya v. Dep't of the Air Force*, 345 F. Supp. 3d 1286, 1301 (D. Haw. 2018). But as discussed in Part II.B above, Ballard never made a request for a reasonable accommodation—her scheduling requests, without any mention of a disability, were insufficient to trigger the ADA's interactive process requirements. Merely asking for a schedule change is not a protected activity and cannot serve as the basis for a retaliation claim. *Tsuji*, 154 F. Supp. 3d at 980.

As for Ballard's second theory, the filing of a formal EEOC complaint also qualifies

as protected activity. *Pardi*, 389 F.3d at 850. Nevertheless, Ballard's irregular schedule and the requirement that she formally apply for a new job opening were not causally connected with her filing of an EEOC complaint for the obvious reason that they took place *before* she filed the complaint.

The Supreme Court has held that Title VII retaliation claims "must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* The Ninth Circuit has adopted this standard in the context of ADA retaliation claims. *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472-73 (9th Cir. 2015).[3]

"When adverse employment decisions closely follow complaints of discrimination," such sequencing can support an inference of a causal connection. *Pardi*, 389 F.3d at 850. But here, the chronology is backwards. When a plaintiff's only protected activity comes *after* the alleged adverse employment actions, there can be no retaliation claim. *Scott v. Mabus*, 618 F. App'x 897, 901 (9th Cir. 2015) ("Scott did not contact the EEOC until after his termination, and therefore he did not engage in any protected participation activity that could have caused any of the alleged adverse actions during his employment.").

Ballard filed her EEOC complaint on November 13, 2018. (Doc. 1 ¶ 14.) But her scheduling requests were made (and denied) months earlier, during her first week as Floating Practice Manager in August 2018. (Doc. 29-3 at 2-19.) Likewise, the exchange in which Ballard expressed interest in an open position and was directed to submit a formal application occurred in early October 2018. (Doc. 1 ¶ 23; Doc. 29-2 at 18.) Therefore, her undesirable schedule and the requirement that she formally apply for the new opening could not have been in retaliation for her filing of the EEOC complaint.

---

[3]     The but-for causation test also applies to Rehabilitation Act retaliation claims. *Brooks*, 1. F. Supp. 3d at 1037.

Accordingly,

**IT IS ORDERED** that:

(1)    Terros's motion for summary judgment (Doc. 29) is **granted.**

(2)    Terros's motion for summary disposition (Doc. 36) is **denied.**

(3)    The Clerk of Court is ordered to enter judgment accordingly and terminate this action.

Dated this 23rd day of April, 2021.

Dominic W. Lanza
United States District Judge